FILED

JUL 1 9 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FLORIN B. PIRV                ,

                    Plaintiff,

v.

GLOCK, INC., et al.,

                    Defendants.

_____

CV 06-145 PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

Plaintiff Florin Pirv brought suit against defendants Glock, Inc., Glock Ges.m.b.H.

(Glock, collectively) and Federal Cartridge Company after his Glock service pistol exploded

during a police department training, causing injuries to his face and hands. Pirv asserts claims

for products liability and negligence against all defendants. This court has jurisdiction pursuant

to 28 U.S.C. § 1332. Pirv's motion for default order and alternative motion for sanctions (#260)

is before the court. Glock defendants' motion for partial summary judgment on Pirv's punitive

damages claim (#256) is also before the court. Finally, Federal Cartridge's motion to strike

FINDINGS AND RECOMMENDATION - Page 1

evidence (#301, #308),[1] motion to strike expert opinions (#302) and motion for partial summary judgment on Pirv's punitive damages claim (#251) are also before the court.

For the reasons set forth below, Pirv's motion for default order and alternative motion for sanctions (#260) should be granted in part and denied in part. Glock Defendants' motion for partial summary judgment (#256) should be granted. Federal Cartridge's motion to strike evidence (#301, #308) should be granted in part, denied in part and denied as moot in part. Federal Cartridge's motion to strike expert opinions (#302) should be denied as moot. Federal Cartridge's motion for partial summary judgment (#251) should be granted.

## BACKGROUND

On March 4, 2004, Florin Pirv was injured when a Glock Model 21 service pistol exploded while he was shooting at the Portland Police Bureau's training range. Glock Ges.m.b.H. manufactured the pistol that malfunctioned. Glock, Inc. assembles and distributes Glock products in the United States. At the time of the incident, the pistol was loaded with .45 ACP ammunition manufactured by Federal Cartridge and supplied to Pirv by the Portland Police Bureau. (Elliot Dep., # 277, at 98-104; Roberts Dep., #277, at 30-31.) A similar pistol failure occurred three days before and involved another police officer. A report prepared by H.P. White Laboratory for the Portland Police Bureau concluded that the most likely cause of the earlier incident was firing a cartridge that improperly had been loaded with a double charge of powder. (Krages Decl., # 274, Ex. 2 at 3.) A later report by H.P. White Laboratory concerning Pirv's accident indicated that the cause of the damage to the pistol was "firing a single cartridge that produced extremely high pressure – well beyond any industry standards." (Krages Decl., # 274, Ex. 3 at 5.)

---

1  Docket number 308 is the unredacted version of docket number 301.

FINDINGS AND RECOMMENDATION - Page 2

I.      **Pirv's Motion for Default and Punitive Damages Claim Against the Glock Defendants**

A.      **Glock's Document Retention and Production**

Both Glock, Inc. and Glock Ges.m.b.H. have a document retention policy. (Krages Decl., #262, Ex. 15, Ex. 16.) Glock, Inc.'s policy directs each department to maintain a list of all retained documents. (Krages Decl., #262, Ex. 15 at 2, 5.) It requires that product liability claim letters or notices be kept for the applicable statute of limitation, that documents regarding current product liability litigation be maintained during the litigation and that documents regarding closed litigation be kept for life. *Id.* at 4. It also directs employees to print emails related to product liability claims and maintain them in the appropriate hard copy file. *Id.* Although the policy states that other email should be retained in electronic form for three years, *id.*, in practice it is kept for ninety days. (Krages Decl., #262, Fletcher Dep. at 26.) In addition, the policy also requires that employees retain general correspondence and warranty documentation for three years, but there is no requirement to preserve records related to every pistol failure, nor does Glock preserve damaged gun barrels if no legal claim is at issue. (Krages Decl., #262, Ex. 15 at 3-4; Krages Decl., #285, Fletcher Dep. at 126, 155.) The policy also requires legal department approval before an employee destroys retained documents. (Krages Decl., #262, Ex. 15 at 2.) Glock Ges.m.b.H.'s policy requires that quality control records, such as quality ratings, supplier evaluations and proof testing records, be kept for ten years. (Krages Decl., #262, Ex. 16.)

1.      **Correspondence With the Portland Police Bureau**

Pirv asked Glock, Inc. to produce "all correspondence and other documents exchanged between Glock, Inc. and the City of Portland after March 1, 2004 pertaining to Glock pistols." (Krages Decl., #262, Ex. 11 at 4.) Glock, Inc. admits that it did not produce a March 28, 2004

letter it sent to the Portland Police Bureau because it could not locate the original letter. (Glock Resp., # 271, at 9.) Pirv asserts that Glock, Inc. also failed to produce two faxes from the Portland City Attorney's office to Glock, Inc. regarding the matter. (Krages Decl., 262, Ex. 9, 10.) Glock's response to the request, however, referred Pirv to documents that the Portland Police Bureau already produced pursuant to a subpoena. (Krages Decl., #262, Ex. 11 at 4.) In addition, although Pirv claims that Glock, Inc. failed to produce a July 22, 2004 letter to the National Association of Police Organizations, he has not submitted evidence that he requested production of that document.

### 2.    Reports of Subsequent Incidents

Pirv requested that Glock, Inc. produce all documents relating to the catastrophic failure of any Glock pistol used by the Doraville Police Department. (Krages Decl., #262, Ex. 14 at 14.) Glock, Inc. did not produce any documents responsive to the request. (Krages Decl., #262, at 1.) Pirv, however, through other means, obtained a letter from Glock, Inc. to the Doraville Police Department stating that Glock Ges.m.b.H. had conducted testing of the failed Glock pistol and concluded that ammunition was at fault. (Krages Decl., #262, Ex. 13 at 4.) Glock, Inc. does not explain its failure to produce the document other than its counsel's statement, unsupported by a sworn affidavit, that it did not destroy the document and instead merely failed to locate it. (Glock Opp., #271, at 8.)

Although Glock, Inc. responded to an interrogatory that it produced all the warranty documents related to failures of Glock pistols chambered for .45 ACP ammunition that it retained, Pirv has located documents that Glock, Inc. failed to produce. (Krages Decl., #298, at 2; Ex. 34 at 9-10; Ex. 35 at 8-10.) Included in these documents is a July 2003 letter from Glock, Inc. to an Arizona customer regarding a Glock 21 failure. (Krages Decl., #298, Ex 36.) Instead,

FINDINGS AND RECOMMENDATION - Page 4

Glock, Inc. produced what appear to be order and shipping tracking documents that contained the failed pistol serial number and a note from Federal stating that Federal should be billed for the repair. (Krages Decl., #298, Ex. 37.) The documents reference an email from Glock, Inc. and a letter from the customer, which were also not produced. (Krages Decl., #298, Ex. 36, 37.) Moreover, although Glock, Inc. produced some documents related to a 2005 failure of a Glock 30 in Kentucky, including a letter from the customer, it did not produce the photographs the customer referred to in his letter. (Krages Decl., #297, at 2, Ex 38.)

In addition, Federal Cartridge produced nine documents addressed to or created by Glock, Inc. regarding pistol failures that Glock, Inc. did not produce any record of whatsoever. (Krages Decl., #298, at 2, Ex. 39 (2005 customer letter to Glock, Inc. and notes by Glock employee regarding Glock 21 failure); Ex. 40 (four letters to Glock, Inc. regarding 2007 Glock 21 failure and Glock, Inc.'s "customer triage" form regarding the incident); Ex. 41 (2008 email to Glock, Inc. regarding Glock 30 pistol failure); Ex. 42 (2008 Glock, Inc. invoice regarding repair of Glock 21); Ex. 43 (2008 email to Glock, Inc. regarding Glock 21 pistol failure resulting in burns to hand, minor fragments in the shooter's face and some fragments in the shooter's eye).

### 3.    Email, Phone Notes, and Communication between Glock, Inc. and Glock Ges.m.b.H.

Pirv states that Glock, Inc. has produced only a single email message and that neither Glock defendant produced any meeting or telephone notes.[2] Glock, Inc. salespeople have laptop computers and factory personnel have desktop computers. (Krages Decl., #262, Fletcher Dep. at 27.) In addition, Glock, Inc. and Glock Ges.m.b.H. communicate regarding design changes,

---

2 Pirv made the statement regarding email in his brief, without submitting a supporting affidavit. (Pl.'s Mot. for Default, #261, at 7.) Glock, however, has not objected to or denied the statement.

FINDINGS AND RECOMMENDATION - Page 5

testing and manufacturing issues with pistols and probably discussed Pirv's pistol failure. (Krages Decl., #262, Fletcher Dep. at 29, 98, 100, 162; Krages Decl. # 297, Fletcher Dep. at 90.) The Glock defendants contend, without a supporting sworn affidavit, that they communicate over the phone or in person. (Glock. Opp., #271, at 11-12.)

### 4.    Metallurgical Reports

Pirv states that Glock, Inc. did not produce a 1991 or a 1994 laboratory report, both of which indicated that the design of the Glock 21 barrel contributed to its failure. (Krages Decl., #262, Ex. 20, 21.) Glock, Inc. states, again without a supporting affidavit, that, pursuant to its document retention procedure, it would not have retained either report. (Glock. Opp., #271, at 12.) Glock, Inc.'s counsel obtained the 1991 report as part of a product liability suit, however, and Glock, Inc.'s retention policy requires that documents regarding closed product liability litigation be kept for life. (Krages Decl., #262, Ex. 15 at 4, Ex. 22.)

### 5.    Discovery Conduct

Pirv has filed three motions to compel in the course of this suit. Pirv filed motions to compel against both Glock defendants in July 2008, which were later denied as moot. (#64, #67, #103.) Part of the dispute concerned Glock, Inc.'s communications with the City of Portland regarding the pistol failure at issue in this case. *Id.*

Pirv again filed motions to compel against both Glock defendants in late August 2009, which were both granted in part. (#152, #155, #199.) The Glock defendants did not produce the files of their testifying experts until Plaintiff filed the motion. (Krages Decl., #262, at 2.) In addition, part of the dispute concerned production of documents related to other Glock pistol failures, which the court ordered the defendants to produce after narrowing the request.[3] *Id.* Pirv

---

3  Pirv claims that Glock, Inc. made a unilateral decision to withhold documents related to pistol

FINDINGS AND RECOMMENDATION - Page 6

also sought to compel Glock Ges.m.b.H. to produce 2-D and 3-D CAD files for the Glock 21 barrel in response to requests for all documents related to the design or development of the Glock 21. (Krages Decl., #262, Ex. 23, at 5.) Glock Ges.m.b.H. responded that it provided all relevant documents but did not confirm that it provided all responsive documents. (Order, #199, at 8.)[4]

Pirv filed his third motion to compel against Glock Ges.m.b.H. in January 2010. The court granted one of Pirv's requests and found two other requests moot as Glock Ges.m.b.H. indicated that it was attempting to locate the responsive documents. (#232, #240.) In addition, after the court partially denied Glock defendants' motions for protective orders related to requests for admissions in November 2009, they took until February and March 2010 to provide responses.[5]

### 6.    Disclosure of Pirv's Medical Information

Despite Local Rule 5.2, which provides that expert reports are not filed with the court, the Glock defendants filed their medical expert reports and fourteen related exhibits with the court, rendering Pirv's medical information available to the public through the court's online docketing system. (#120 - #134.) Four days later, Pirv's counsel requested they withdraw the filings. (Krages Decl., #262, Ex. 27.) Pirv's counsel sent another request three weeks later, indicating

---

failures that occurred more than 10 years before his accident and that did not involve the Glock 21 model and did not disclose that it was withholding those documents. I reviewed this issue when I addressed Pirv's motion to compel and note that Glock, Inc. objected to Pirv's discovery requests as overly broad, an objection I sustained in part when I narrowed Pirv's discovery request.

4    Glock Ges.m.b.H. provided only a hard copy of design drawings and later indicated that it had "computer-assisted design (CAD) files." (Krages Decl., #262, Ex. 25 at 3.) Pirv, however, has not introduced evidence that Glock Ges.m.b.H. retained and failed to produce the electronic files.

5    Pirv makes this statement in his brief, without a supporting affidavit. (Pl. Mot. for Default, #261, at 11.) Glock, however, did not object, nor did it deny the statement.

that he would address the issue with the court if Glock failed to take action. (Ex. 28.) Glock

asked the court to withdraw the filings that same day. (Ex. 29.) Glock asserts, without a

supporting affidavit, that its disclosure of Pirv's medical information was an "honest mistake."

(Glock Opp., #271, at 19.)

### B.    Expert Testimony Regarding Glock 21 Design Flaws and Flaws in the Manufacturing Process

Pirv has submitted expert opinion that the Glock 21 pistol design is flawed because it

cannot withstand the high pressure associated with overloaded ammunition.[6]  Charles Rostocil, a

design engineer, opined that, although the Sporting Arms and Ammunition Manufacturers

Institute (SAAMI) has a voluntary standard that ammunition should not exert pressure in excess

of 21,000 psi, pistols chambered for .45 ACP ammunition should withstand pressure of 75,000

psi because of the increased risk of high pressure from overloaded rounds. (Rostocil Decl., #279

at 2.)  He also opined that the Glock 21 chamber walls are too thin such that deviations in

manufacturing process will result in a weak barrel. *Id.* at 1-2.  He further opined that the case

hardening process exacerbates the problem because it increases the brittleness of the surface

layer of the barrel and renders the core layer of steel insufficiently "flexible" or "tough" to absorb

the shock of firing overloaded ammunition. *Id.* at 2-3.  In addition, Roy Ruel, a mechanical

engineer, opined that the rails Glock Ges.m.b.H. uses to secure the pistol to the frame are not

sufficiently strong to retain the slide on the frame in the event of a catastrophic failure. (Ruel

Decl., # 280 at 2.)

Pirv has also submitted expert opinion that Glock failed to institute proper safety

---

6  Glock objects to the expert declarations. I address that objection below and mention the
opinions here only insofar as they relate to the question of Glock's notice of the alleged
defects.

FINDINGS AND RECOMMENDATION - Page 8

measures in the manufacture of the Glock 21. Rostocil indicated that proof testing is an "industry-wide" practice and the only means of detecting a pistol's hidden defects, such as a flaw in the steel. (Rostocil Decl., #279 at 4.) Glock admits that it does not proof test pistols sold in the United States. Pirv also asserts that Glock Ges.m.b.H. does not adequately test pistols for the depth of the case hardening. Finally, Pirv asserts that Glock Ges.m.b.H. should prohibit its steel suppliers from using scrap metal to produce the steel that it uses to make its pistols because scrap metal might introduce impurities that could weaken the steel.

### C.    Glock Ges.m.b.H.'s 1991 Redesign of the Glock 21

Glock Ges.m.b.H. redesigned the barrel of the Glock 21 in 1991. A comparison of the 1990 Glock 21 drawing with the 1999 Glock 21 drawing shows that the 1999 version has a wider feed ramp. (Brondo Decl. ,#316, Ex. E; Krages Decl., #328, Ex. 74.) Pirv's expert, Rostocil, indicates that the sole design change was to extend the length of the feed ramp and widen the base of the feed ramp. (Rostocil Supp. Decl., # 325, at 7-8.) He further indicates that, with the exception of the reduced chamber wall thickness where the feed ramp attaches to the chamber, all other dimensions, such as the width and length of the chamber and the thickness of the chamber walls, remained the same. *Id.* The Glock 21 at issue in this case was manufactured in 2001 and so has the 1999 design.

### D.    Glock's Awareness of and Response to Other Incidents

Glock Inc.'s vice president in charge of the technical department testified he does not know whether his staff members have engineering backgrounds or whether Glock, Inc. ever sent a pistol to an outside firm for evaluation, but that Glock Ges.m.b.H. has engineers on staff and does testing including metallurgical evaluations. (Fletcher Dep., #285, at 43, 85, 168-169.) Glock Ges.m.b.H.'s documents concerning barrel failures from 1999 until 2009, however, state

FINDINGS AND RECOMMENDATION - Page 9

brief conclusions regarding the cause of the failure, such as "over pressure," "bulged barrel," and "torn barrel", and do not indicate that any metallurgical testing was performed. (Krages Decl., #284, at 1.) Glock, Inc.'s warranty documents contain brief notes on the repair performed and/or the possible cause of the damage. (Krages Decl., #262, Ex. 18.)

Pirv's expert witness opined that Glock's documents concerning failed pistols contain insufficient information to inform a gun designer regarding possible means to improve firearm safety. (Rostocil Decl., #279, at 6.) Glock's expert witness, however, attributes the brevity to the fact that, in his experience, the cause of a failure becomes obvious to the person examining a failed pistol, because that person has likely reviewed many similar failures. (Hutton Dep., #285, at 56-61.)

### 1.    Incidents Preceding Pirv's Accident

Pirv has submitted evidence of a 1992 lawsuit and a 1995 claim against Glock, Inc. and a 1995 lawsuit against both Glock, Inc. and Glock Ges.m.b.H. that all involved the failure of a Glock 21 that resulted in injuries alleged to be severe. (Krages Decl., #284, Ex. 26, Ex. 29, Ex. 30.) In one suit, Glock, Inc. received an expert report that concluded the pistol left the manufacturer in "a dangerously unsafe metallurgical condition" and was defectively designed because there was "too little thickness of steel . . . surrounding the firing chamber." (Krages Decl., #284, Ex. 9 at 1, 4; Rockafellow Decl., #282.)[7] The other suit alleged that both the reloaded ammunition involved and the Glock 21 pistol were defective. (Krages Decl., #284, Ex. 29.) Finally, Pirv submitted a claim letter a lawyer sent to Glock regarding a pistol failure during a police training exercise. (Krages Decl., #284, Ex. 30.) The letter does not indicate anything

---

7  Glock Ges.m.b.H. "is generally aware of claims made and materials produced by attorneys with regard to litigation in the United States. (Krages Decl., #284, Ex. 25 at 5.)

FINDINGS AND RECOMMENDATION - Page 10

about the cause of the failure. *Id.* The Bates stamp on these documents indicates that they were produced by Glock, Inc.

The evidence also shows that Glock received three reports from customers who suffered injuries as the result of a Glock 21 failure. In 2003, Glock received a letter from a police department stating that an explosion "blew the magazine out of the weapon," injuring the officer's hand. (Krages Decl., #284, Ex. 34.) The only cause of the incident noted, however, is the statement, "The feed ramp on the barrel appears to be notched or cracked and may have dropped down."[8] *Id.* Glock admits in its brief that this involved a 1999 design Glock 21. (Glock Reply, #313, at 29.) The other two reports involved reloaded, rather than factory-issued, ammunition, and nothing indicates that Glock was aware of the cause of the incident. (Krages Decl., Ex. 27 (1992 incident), Ex. 36 (2002 incident); Graves Decl. #281 (no indication that Glock received a copy of the laboratory report of the 1992 incident).) Moreover, the 1992 incident involved a pre-1999 Glock and for the 2002 incident, the year of manufacture is unclear. The Bates stamp on the documents related to the 2002 and 2003 incidents indicates that they were produced by Glock.

Pirv has also submitted evidence that Federal shared information with Glock, Inc. regarding five different Glock 21 pistol failures that occurred between 1994 and 2004.[9] Included in that evidence are three Federal incident reports regarding pre-1999 Glock 21 failures that either suggest that ammunition was overloaded or contain no information regarding how the pistol failure occurred. (Krages Decl., #284, Ex. 14 at 1("It appears . . . that a case separation

---

8  Glock also states in its brief that its examination revealed that the pistol was not damaged, but cites no evidence to support that assertion. (Glock Reply, #313, at 29.)

9  Pirv also submitted a Federal Cartridge report regarding a Glock 30 failure. (Krages Decl., #284, Ex. 32.) I have not considered that evidence because it involves a different model.

FINDINGS AND RECOMMENDATION - Page 11

occurred."), Ex. 28, Ex. 31.) One of those reports reflects that the user suffered an injury, but it is not clear whether Federal shared that information with Glock. (Krages Decl. #284, Ex. 28.) The two other incidents are a 2003 report and a 2004 report that merely reflect that Glock knew about the pistol failure but do not indicate whether the pistols had the 1999 design or whether Glock knew any details concerning the cause or if there was an injury. (Krages Decl., #284, Ex. 35, Ex. 37.)

Other evidence includes correspondence from a police department to Glock, Inc. regarding a 2002 incident involving two Glock 21 pistols that exploded using Federal ammunition. (Krages Decl., #284, Ex. 33 at 5, 6.) Neither party has submitted admissible evidence indicating that the Glock 21 pistols are the 1999 design, but Glock admits in its brief that one of the pistols is. (Glock Reply, #313, at 29.) Although notes on Federal Cartridge's report regarding the incident state, "we suspect . . . a deficiency in the [barrel] material . . . caused the failure," no evidence indicates that this information was shared with Glock. (Krages Decl., #284, Ex. 33 at 16.) Federal appears to have copied Glock on the letter it sent to the police department about the incident, but that letter states that Federal was unable to determine a cause for the failure. *Id.* at 17, 19.

### 2. Incidents That Occurred After Pirv's Accident

Pirv has submitted evidence of four incidents that took place after the accident as issue in this case. The first is a 2005 incident involving Federal ammunition. (Krages Decl., #284, Ex. 15.) However, no cause for the pistol failure is indicated on the customer letter to Glock and it is not clear whether the Glock 21 that failed is the 1999 design. *Id.* The second is another 2005 Glock 21 failure where Glock, Inc. wrote to the customer stating that it had sent the pistol to Austria for testing, which had revealed ammunition as the cause, but did not provide any

FINDINGS AND RECOMMENDATION - Page 12

documents to the customer to support that assertion. (Krages Decl., #284, Ex. 50; Brown Decl., #283, at 2.) The other two incidents are local news accounts of Glock 21 pistol failures that occurred in 2009 and 2010. (Krages Decl., #284, Ex. 38, 39.) The reports contain no information about the ammunition involved, the cause of the failures or Glock's response to them, nor do they reflect whether Glock was even aware of the failures.

### E.    Glock's Response to Pirv's Accident

Following Pirv's accident, the Portland Police Bureau held discussions with Glock, Inc. The Police Bureau and its liaison to the city attorney's office met with Glock to discuss a trade of the Bureau's Glock 21 models for different models. (Krages Decl., #262, Ex. 4 at 4.) During those discussions, Glock, Inc. asked the Bureau to send the pistols to its office in Georgia for testing. (Krages Decl., #262, Ex. 3 at 4.) The Bureau eventually refused to send the pistols to Glock, Inc. for testing and subsequently purchased replacement weapons. (Krages Decl., #262, Ex. 4 at 5.) The City of Portland filed suit against Glock Inc. and Glock Ges.m.b.H. in March 2006. The suit alleged strict products liability, negligence and breach of contract claims. The City voluntarily dismissed the action in September 2006.

Glock, Inc. did not prepare any documents informing its employees to preserve documents in relation to the City of Portland suit or Pirv's suit. (Krages Decl., # 297, Ex. 44 at 4-5.) In addition, Glock, Inc.'s vice president in charge of the technical department testified that he did not give a specific order to preserve records following Pirv's accident but that employees would be expected to follow the records retention policy. (Krages Decl., #262, Fletcher Dep. at 22-25.) He also testified that, since there was an injury involved, records would have been forwarded to the general counsel's office. *Id.* He further testified that Glock general counsel was to participate in a meeting with the Portland Police Bureau regarding Pirv and the other officers'

FINDINGS AND RECOMMENDATION - Page 13

pistol failures. *Id.* at 85.

## II.    Pirv's Punitive Damages Claim Against Federal Cartridge

### A.    Pirv's Expert Testimony Concerning Federal Cartridge's Quality Controls

Pirv offers the testimony of Rostocil and Ruel in support of his claim for punitive

damages.[10] Rostocil's declaration states that overcharged ammunition can cause a firearm to fail,

resulting in injury to the shooter. (Rostocil Decl., #287, at 2.) He opines that the cartridge in

Pirv's case generated excessive pressure when fired. (Rostocil Supp. Decl., #323, at 3.) He

could not, however, identify what caused the cartridge to be over-pressured. *Id.* at 4. He did

state that ammunition manufacturing systems that measure powder by volume may fail to

prevent overloading of a cartridge because variations in the powder batch or the presence of

liquid in the powder could affect the powder's bulk density. (Rostocil Decl., #287, at 2.)

Pirv's experts opine that Federal Cartridge could have minimized the occurrence of

overloaded ammunition in several ways. First, they indicate that Federal could have used certain

brands of powder that result in loads that are sufficiently bulky such that a serious overload of

powder in the cartridge is unlikely. (Rostocil Decl.,#287, at 3; Ruel Decl., #276, at 2.) Rostocil

indicates that those powders were commercially available in 2001 when Federal manufactured

the cartridge at issue. (Rostocil Supp. Decl., #323, at 4.) Second, Rostocil opines that the device

Federal uses to measure the amount of powder in a cartridge could be improved to record how

many casings it rejects and the time and date that it does so. (Rostocil Decl.,#287, at 4.) He also

indicates that Federal could better detect overloaded cartridges by using a system that measures

the weight of the powder rather than its volume and that it is possible to design such a system.

*Id.*

---

10 Federal has moved to strike the expert declarations. I address that motion below and mention
    the expert opinions here only insofar as they relate to Federal's notice of the alleged defects.

### B.    Federal Cartridge's Awareness of and Response to Other Incidents

Pirv's experts both testified that it is known in the firearms and ammunition industries

that original factory ammunition is at risk of being over-pressured despite quality assurance

controls. (Ruel Decl., #276, at 2; Rostocil Decl., #287, at 2.) Federal's quality manager

testified, however, that he has never, in his long history with the company, seen evidence of an

excessively overcharged or double charged Federal .45 cartridge come back from the field, nor

has he seen such evidence from their facility. (Eden Decl., # 306, Ex. 3 at 259.) Rather, when he

sees a report that indicates a problem with the ammunition, he would attribute the problem to a

hand load of the cartridge, out-of-battery firing, or some other cause, and request to see the

evidence. *Id.* He admitted, however, that he cannot determine from a fired round itself whether

it was overcharged. *Id.*

### 1.    Incidents Preceding Pirv's Accident

Pirv has submitted evidence that Federal was aware of five incidents, from 1997 until

2004, involving a failure in the webb or feed ramp area of the firearm. (Krages Decl., # 274, Ex.

17 ("CTG blew out in area over the feed ramp."), Ex. 20 at 8 ("CTG case blew out in

unsupported area of ramp."), Ex. 21 at 1, 6 ("This is a ductile failure . . . Stress during firing

exceeded case strength, primer pocket expanded," cartridge "blew down through feed ramp."),

Ex. 26 ("Blown at webb."), Ex. 27 ("CTG case ruptured in unsupported area!").)` Federal's

quality control director testified that a blow out in the feed ramp area may be the result of a

firearm manufacturing defect resulting in the feed ramp's failure to fully support the cartridge.

(Eden Decl., #306, Ex. 3 at 147, 191, 235.) Pirv's expert, Rostocil, testified that high pressure in

the feed ramp area will cause the cartridge to open up and vent out the bottom of the firearm and

that blowing out at the webb and primer pocket expansions are "classic signs of over over-

FINDINGS AND RECOMMENDATION - Page 15

pressure ammunition." (Rostocil Decl., #275, at 2.)

Pirv has also submitted evidence that Federal was aware of six other incidents where there is some indication that the ammunition was at fault, but the exact cause is unclear. (Krages Decl., # 274, Ex. 18 at 2 ("We don't know exactly why this happened, but it looked like pressure from the way the metal moved."), Ex. 19 at 3 (gun owner's friend, a U.S. marshal, stated it looked like an ammunition problem), Ex. 22 ("CTG case appeared to be 'weak'"), Ex. 23 (cartridge was "badly distorted"), Ex. 24 ("CTG blew up in the chamber!"), Ex. 25 ("Gun company claims this is a 'classic double charge.' We don't know if the gun company ever saw the gun. . . . Rec'd two fired cases (one from chamber and [one] that fired in magazine).")

Finally, Pirv has submitted evidence that Federal was aware of nine "bullet in bore" or "squib load" incidents that took place between 1994 and 2003. (Krages Decl., #274, Ex.28, Ex. 29 (gun range complaint of four bullet in bore incidents involving four different guns), Ex. 30, Ex. 31, Ex. 32, Ex. 33.) Such incidents can occur either if the cartridge does not contain enough powder or if the powder is contaminated "with a solvent or WD-40 or something like that" that has seeped in and desensitized the powder charge. (Krages Decl., #288, Svendsen Dep. at 195-196.) There is no indication that the incidents resulted in any injuries.

In four of the twenty prior incidents, Federal's records indicate that the user suffered an injury. (Krages Decl., # 274, Ex. 19 ("Injury to both hands and left cheek . . . He lost his thumb nail and now believes he has nerve damage" in his hands), Ex. 22 ("Had piece of steel thru [sic] thumb."), Ex. 23 ("His hand stung for awhile and the recoil made the gun fly-up and hit him in the head [and] now his wrist 'pops.'"), Ex. 27 (customer "was hit under the eye [and] has a shiner"). Only one, however, resulted in a serious injury. (Krages Decl., # 274, Ex. 19 (possible nerve damage).)

FINDINGS AND RECOMMENDATION - Page 16

2.     Incidents Subsequent to Pirv's Accident

Pirv has submitted evidence that Federal Cartridge was aware of six incidents that took place after the March 2004 accident at issue.  One incident involved a failure in the webb or feed ramp area of the firearm.  (Krages Decl., # 274, Ex. 35 ("Blew down thru [sic] feed ramp").)  In two incidents, overloaded ammunition was indicated as a cause or possible cause.  (Krages Decl., # 274, Ex. 36 ("Possible double charge . . . doesn't look like relo[ad].￼"), Ex. 42.)  In two other incidents, "bullet in bore" was listed as the cause.  (Krages Decl., # 274, Ex. 39, 40.)  In the one other incident, there is no indication as to a possible cause.  (Krages Decl., # 274, Ex. 37.)  In four of the six incidents, Federal Cartridge's record indicates that the user suffered an injury. (Krages Decl., # 274, Ex. 35, Ex. 36, Ex. 37, Ex. 38.)

C.     Federal Cartridge's Disclosure of Information to Pirv

Federal Cartridge's expert testified that a video and photographs were taken of all aspects of the operation of Federal's cartridge loader but that he himself did not take the photos or video because of federal regulations and other security and confidentiality agreements.  (Krages Decl., #321, Schmidt Dep. at 73-75.)  He asked for and kept only some of the photographs.  *Id.*  When Pirv requested production of all data or other information that the expert considered in forming his opinion, Federal Cartridge objected to production of the video because it was not part of Schmidt's expert file.  (Krages Decl., #274, Ex. 44 at 4, 10.)  Federal has not, however withheld documents pursuant to International Traffic in Arms Regulations.  (Eden Decl., #305, Ex. 10.)

## LEGAL STANDARDS

I.     Motion for Default Order or Adverse Inference

In a diversity case, federal law controls discovery sanctions.  *See Medical Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806, 824 (9th Cir. 2002) (applying federal law).  A district court

FINDINGS AND RECOMMENDATION - Page 17

can sanction a party who has despoiled evidence either under "the inherent power of federal

courts to levy sanctions in response to abusive litigation practices" or under Federal Rule of Civil

Procedure 37, which provides for sanctions against a party who "fails to obey an order to provide

or permit discovery." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citation

omitted).  Under Rule 37, if a party fails to provide information in discovery, the court may "may

inform the jury of the party's failure" and impose other appropriate sanctions, including

"rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37 (b)(2)(A)(vi), (c)

(1).  The decision to impose sanctions is left to the court's "broad discretion to make discovery

and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Sec. Ins.*

*Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (citation omitted).

## II.    Motion to Strike

Evidence submitted in a motion for summary judgment must satisfy the requirements of

Federal Rule of Civil Procedure 56.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-1037 (9th Cir.

2003).  Under that standard, the court may consider evidence on summary judgment if the party

offering it could present the evidence in an admissible form at trial.  *Id.* at 1037.

## III.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Summary judgment is not proper if material factual issues exist for trial.  *See, e.g., Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986).  The court cannot weigh the evidence or determine the truth

and must construe the evidence in the light most favorable to the nonmoving party. *Playboy*

*Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002).  An issue of fact is genuine "if the

FINDINGS AND RECOMMENDATION - Page 18

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Villiarimo v. Aloha Island Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).

## DISCUSSION

### I.   Motion for Default Order or Adverse Inference

A court may impose a default judgment as a discovery abuse sanction only in "extreme

circumstances." *United States Use of Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600,

603 (9th Cir. 1988) (citation omitted).[11]  The court must weigh five factors before before entering

a dismissal or default judgment against a disobedient party: "(1) the public's interest in

expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of

prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on

their merits; and (5) the availability of less drastic sanctions." *Stars' Desert Inn Hotel & Country

Club, Inc. v. Hwang*, 105 F.3d 521, 524 (9th Cir 1997) (citation omitted).  "The first two of these

factors favor the imposition of sanctions in most cases, while the fourth cuts against a default or

dismissal sanction.  Thus the key factors are prejudice and the availability of lesser sanctions."

*Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir 1990).  The test however, "is not mechanical.

It provides the district court with a way to think about what to do, not a set of conditions

precedent for sanctions." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d

1091, 1096 (9th Cir. 2007).

Moreover, a court may impose default as a sanction only when the sanctioned party's

non-compliance is due to "willfulness, fault, or bad faith." *Sigliano v. Mendoza*, 642 F.2d 309,

---

11 The same standards apply to both dismissal and default as potential discovery sanctions.
*United States Use of Wiltec Guam, Inc.*, 857 F.2d at 603 n.5.  In addition, the Ninth Circuit
treats dismissal sanctions under Rule 37 the same as those under a court's inherent powers and
therefore uses both types of cases interchangeably. *Id.*

310 (9th Cir. 1981). "Willfulness" includes "disobedient conduct not shown to be outside the control of the litigant." *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 948 (9th Cir. 1993). In addition, even when a court imposes a lesser evidentiary sanction than outright dismissal, it must find that the party's conduct was willful, at least to the extent that it destroyed evidence after it was on notice of its potential relevance to the litigation. *Unigard Sec. Ins. Co.,* 982 F.2d at 368 & n.2; *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *see also Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

Here, the first two factors weigh only slightly in favor of a imposing default as a sanction, while the fourth factor weighs against it. With regard to the fourth factor, obviously, entering a default judgment eliminates the opportunity to resolve this case on the merits. With regard to expeditious resolution of litigation and this court's ability to manage its own docket, this case has burdened the court with voluminous discovery motions. Both Pirv and the Glock defendants' conduct contributed to the sorry state of affairs, however. While the Glock defendants were not always forthcoming, Pirv in some cases was over-reaching.

## A.    Prejudice

Courts determine prejudice not by asking whether the documents would have changed the outcome at trial, but instead by inquiring whether concealment of the documents clearly impaired the opposing party's ability to go to trial and threatened to interfere with the rightful decision of the case. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 354-354 (9th Cir. 1995). In *Anheuser-Busch*, the Ninth Circuit found prejudice when a party's refusal to provide certain documents "forced Anheuser to rely on incomplete and spotty evidence" at trial. *Id.* at 354. A court may, however, find a lack of prejudice where the party seeking sanctions has obtained all necessary information. *See McDonald v. Sun Oil Co.*, 423 F. Supp. 2d 1114, 1123

FINDINGS AND RECOMMENDATION - Page 20

(D. Or. 2006) (plaintiff could not establish prejudice from the loss of defense expert witness notes where the plaintiff "received all necessary information relating to the basis of the experts' opinions and their methodology").

Here, Pirv has shown that Glock, Inc. has failed to retain or produce fourteen documents related to other pistol failures, and that both Glock defendants have failed to produce any email, telephone or meeting notes. Even if the fourteen documents themselves are not particularly damning, they nonetheless show that Glock, Inc.'s document retention and production is not as thorough as it should be, which suggests that other documents could also have slipped through the cracks. Moreover, while I have no way of knowing what emails and meeting notes might have contained, in my experience such communication is a rich source of information regarding a party's thoughts and actions at the time of the incidents at issue in the case. I therefore conclude that the Glock defendants' failure to retain or produce documents has prejudiced Pirv. Glock's other discovery conduct, however, has not significantly prejudiced Pirv.

### B.    Willfulness

A party's destruction of evidence qualifies as willful spoliation if the party "has some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (citation omitted). Sanctions, however, are not appropriate where a party has no notice of the pending litigation and merely destroys evidence pursuant to a document retention policy. *Akiona*, 938 F.2d at 161 (no adverse inference warranted where, several years before incident that gave rise to the litigation, government destroyed records pursuant to policy). Moreover, "[a]bsent exceptional circumstances, a court may not impose [Rule 37] sanctions . . . on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Evid. 37(e).

FINDINGS AND RECOMMENDATION - Page 21

Here, Pirv has presented sufficient evidence to indicate that Glock, Inc. either lost or destroyed documents after it had notice that they were potentially relevant. Pirv's accident occurred in 2004 and he filed suit in 2006. Glock, Inc. failed to produce a 1991 laboratory report that its counsel obtained as part of a prior lawsuit, and which, according to the document retention policy, Glock, Inc. would have retained "for life." More importantly, the evidence shows that Glock, Inc. failed to either retain or produce several documents dating from 2007 and 2008 and has not produced a single email, despite evidence that it sometimes sent emails in relation to warranty claims. In addition, while counsel for Glock has been vociferous in his assertion that the Glock defendants merely lost a few documents and that they do not communicate via email, he has produced no sworn affidavit to support those claims, nor has he explained his failure to do so. I find this evidence sufficient to suggest that Glock, Inc. failed to take proper measures to preserve documents after it had notice of Pirv's suit.

Pirv's evidence against Glock Ges.m.b.H., however, is not convincing. Pirv indicates that Glock Ges.m.b.H. did not produce email or phone or other meeting notes from any time period, despite the fact that the evidence shows that Glock, Inc. and Glock Ges.m.b.H. communicate to each other regarding pistol failures. Pirv, however, has no evidence that Glock Ges.m.b.H. destroyed any documents. While I find the lack of email highly suspicious, I have no evidence to conclude that Glock Ges.m.b.H. destroyed email or notes at a time when it was aware of its relevance to Pirv's suit. I therefore conclude that an award of sanctions against Glock Ges.m.b.H. is inappropriate.

### C.    Availability of Lesser Sanctions

The availability of lesser sanctions requires that the court to (1) consider the feasibility of lesser sanctions and explain why alternative sanctions would not be appropriate; (2) implement

FINDINGS AND RECOMMENDATION - Page 22

alternative sanctions before ordering dismissal; and (3) warn the disobedient party of the possibility of dismissal "before actually ordering it." *Hyde & Drath v. Baker*, 24 F.3d 1162, 1167 (9th Cir. 1994). Thus, "[a]s a general rule, the district court must consider less severe alternatives and discuss them if it elects to dismiss." *United States Use of Wiltec Guam, Inc.*, 857 F.2d at 605 ("[T]he failure to warn may place the district court's order in serious jeopardy.") Under "egregious circumstances," however, an explicit warning is not necessary. *Id.*

Here, I have neither issued a warning to Glock, Inc., nor have I imposed lesser sanctions. Moreover, although Glock, Inc. sometimes delayed in producing discovery, nothing suggests that it completely defied any of this court's previous discovery orders. Thus, I find that its behavior has not been so obstreperous so as to justify a default judgment without a previous warning or the imposition of a lesser sanction.

### D.    Appropriateness of a Lesser Sanction

The court has the power to sanction a party responsible for the destruction of evidence "by instructing the jury that it may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party." *Medical Lab. Mgmt. Consultants*, 306 F.3d at 824. "A factually specific, case-by-case analysis necessary to determine proper penalty for destruction of evidence." *Unigard Sec. Ins. Co.*, 982 F.2d at 369. An adverse inference serves both an evidentiary and a deterrence rationale. *Akiona*, 938 F.2d at 161. (citation omitted). "The evidentiary rationale is . . . the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy [it] is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." *Id.* (citation omitted). Under the deterrence rationale, "allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be

FINDINGS AND RECOMMENDATION - Page 23

introduced at trial."

Here, Pirv has established that Glock, Inc. failed to produce responsive documentary evidence over the course of discovery in this litigation and the failure likely resulted in spotty evidence regarding the alleged defects and Glock, Inc.'s awareness of a potential defect. The documents that Pirv proved that Glock, Inc. failed to produce, however, are not particularly damning. Moreover, I can only infer that Glock, Inc. destroyed emails and meeting notes and that those records would likely have aided Pirv's case. Thus the evidentiary rationale for imposing sanctions is relatively weak here. I am troubled, however, that Glock, Inc. did not provide a sworn affidavit explaining its failure to produce the documents. A party that has both demonstrably failed to produce documents and failed to offer any sworn testimony to explain its conduct should not be able to proceed with impunity. Thus, I find that the deterrence rationale is well served here. I therefore find that an adverse inference sanction is appropriate. The court should accordingly grant Pirv's alternative motion for an adverse inference instruction against Glock, Inc.

## II.    Motions to Strike and Evidentiary Objections

The defendants have raised numerous evidentiary objections. In some instances, their objections relate to evidence that is irrelevant to my analysis. Some of the evidentiary objections merit further discussion, however. I address those below. The remainder of the evidentiary objections are denied as moot.

### A.    Evidence of Other Incidents Involving Defendants' Products

As set forth in detail above, Pirv has submitted several accounts of incidents involving Federal Cartridge .45 ACP ammunition and/or Glock 21 pistols. Federal Cartridge moves to strike this evidence on the grounds that it constitutes hearsay, that the declarants in some cases

FINDINGS AND RECOMMENDATION - Page 24

lack personal knowledge, that the evidence contains inadmissible offers of compromise and

because the incidents are insufficiently similar to the accident at issue in this case. Glock argues

that reports of prior incidents constitute unauthenticated hearsay and that the incidents are

insufficiently similar. In addition, both Federal Cartridge and Glock argue that incidents that

occurred after Pirv's accident are irrelevant to the issue of punitive damages. I address their

arguments below.

### 1.   Hearsay

"Hearsay is a statement, other than one made by the declarant while testifying at the trial

or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A

statement offered for a purpose other than to prove the truth of the matter asserted is not hearsay.

*Orsini v. O/S Seabrooke*, 247 F.3d 953, 960 (9th Cir. 2001) (holding that statements of others that

plaintiff repeated in his affidavit were not hearsay because they were relevant to prove the

plaintiff's state of mind and the effect the statements had on him, not the truth of the matters

asserted).

Here, the various accounts of other incidents that Pirv has submitted as evidence are

relevant beyond the truth of the statements contained therein. They are relevant to prove whether

the defendants had knowledge of other accidents involving their products. As a result, I find that

the statements are non-hearsay if considered for the limited purpose of determining whether the

defendants had knowledge of other incidents similar to the incident at issue here.

### 2.   Authentication and Personal Knowledge

Both Federal Cartridge and Glock contest whether Pirv has submitted evidence that is

properly authenticated and based on personal knowledge. Federal Rule of Evidence 901(a)

requires that the proponent of evidence must, "as a condition precedent to admissibility, [present]

FINDINGS AND RECOMMENDATION - Page 25

. . . evidence sufficient to support a finding that the matter in question is what its proponent

claims." Fed. R. Evid. 901(a). Rule 602 relates to personal knowlwdge and provides, "A witness

may not testify to a matter unless evidence is introduced sufficient to support a finding that the

witness has personal knowledge of the matter. " Fed. R. Evid. 602.

I find that Pirv could present the evidence contained in the reports in an admissible form

at trial. Nothing indicates that Pirv will be unable to secure testimony at trial that authenticates

the accounts of other incidents. Moreover, since I do not consider the accounts for the truth of

the matters asserted therein, the fact that statements in the accounts in some cases were made by

individuals who lacked personal knowledge is immaterial.

### 3. Offers of Compromise

Federal Cartridge and Glock argue that the evidence of prior incidents is inadmissible to

the extent that they contain offers of compromise. In relevant part, Federal Rule of Evidence

408(a) provides that offers of compromise, or "statements made in compromise negotiations

regarding the claim" are inadmissible to prove liability for the claim. Fed. R. Evid. 408(a). As

noted above, I have considered the accounts of other incidents only as evidence of the

defendants' knowledge of prior incidents, not as evidence of their liability for those incidents.

Thus, Rule 408(a) is not implicated. *See* Fed. Rule of Evid. 408(b) ("This rule does not require

exclusion if the evidence is offered for purposes not prohibited by subdivision (a).")

### 4. Sufficient Similarity

A plaintiff may "introduce evidence of other accidents as direct proof of negligence, a

design defect, or notice of the defect" provided the plaintiff can demonstrate "substantial

similarity" between the other incidents and the accident at issue. *White v. Ford Motor Co.*, 312

F.3d 998, 1009 (9th Cir. 2002) (citation omitted) (holding trial court did not err in admitting

FINDINGS AND RECOMMENDATION - Page 26

evidence of a prior incident where expert testimony indicated that the same design defect caused the incident). "The rule rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility." *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991). Moreover, the "similar circumstances requirement is much more strenuous when the evidence is being offered to show the existence of a dangerous condition or causation and less strict where the evidence is being offered to show notice." *Pau v. Yosemite Park*, 928 F.2d 880, 889 (9th Cir. 1991) (quoting the district court and holding it applied the proper standard); *see also White*, 312 F.3d at 1009 (although district court allowed the jury to hear evidence of prior incidents, it redacted reports of incidents that took place after the plaintiff's accident).

Here, I have considered the accounts of other incidents only with regard to whether they show that the defendants had notice of other incidents involving their products. Moreover, I am cognizant of the limited relevance of incidents that are dissimilar to the accident at issue in this case. The court should therefore deny Federal Cartridge's motion to strike and overrule Glock's objection concerning the prior incident evidence. I note, however, that my recommendation does not address whether the evidence would be admissible at trial.

### 5.    Relevance of Incidents That Occurred After Pirv's Injury

"[T]he Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007); *see also Mason v. Householder*, 58 Or. App. 192, 195 (1982) ("[M]atters occurring after the tortious act are not material to the issue of punitive damages, unless they constitute evidence of the manner in which the complained of event occurred."); *Byers v. Santiam Ford, Inc.*, 281 Or. 411, 416 (1978) (trial court properly excluded evidence of

FINDINGS AND RECOMMENDATION - Page 27

defendant's conciliatory attitude after the complaint was filed because it bore "scant relevance" to the defendant's state of mind at the time of the incident at issue). Rather, a jury may consider harm to nonparties only as part of its calculation of an appropriate award because such evidence may show that the defendant's conduct was particularly reprehensible. *Philip Morris USA*, 549 U.S. at 356-357.

If, however, a plaintiff has presented evidence of the defendant's "deliberate disregard" at the time of the incident at issue, then evidence of the defendant's post-accident misconduct may be relevant to the extent that it is probative of the defendant's state of mind at the time of the accident. *See Joachim v. Crater Lake Lodge*, 48 Or. App. 379, 389-390, 617 P.2d 632 (1980) (trial court properly admitted evidence that defendant took down notices regarding water contamination after plaintiff left the lodge when plaintiff also presented evidence that, while plaintiff was at the lodge, defendant removed newspaper accounts of the contamination from the lodge lobby); *see also Groth v. Hyundai Precision & Ind. Co.*, 209 Or. App. 781, 786, 149 P.3d 333 (2006) (holding that trial court properly submitted punitive damages to the jury in part because evidence showed that defendant refused to cooperate in the investigation of the accident at issue, and refused to correct the defect or to warn users).

Here, I find that the reports of accidents that occurred subsequent to Pirv's accident are not probative of the defendants' state of mind at the time of Pirv's accident. Unlike the situation in *Joachim* and *Groth*, where the defendant's undertook subsequent efforts to conceal the accident at issue in the case, here the subsequent events evidence does not involve Pirv's accident. Rather, it relates to wholly separate incidents which, in some cases, occurred more than six years after Pirv's accident. While the evidence of later incidents resulting in injuries is troubling, it contains no information relevant to show that, at the time Pirv was injured, the

FINDINGS AND RECOMMENDATION - Page 28

defendants knew of the risks that their products posed and intentionally jeopardized their customers. I therefore sustain Glock's objection to the evidence and grant Federal's motion to strike to the extent that I will not consider the subsequent accident evidence in assessing whether the punitive damages claim should go to the jury.

### B.   Expert Opinions

In order to prevail on his punitive damages claim, Pirv must offer evidence that defendants "acted with malice or ha[ve] shown a reckless and outrageous indifference to a highly unreasonable risk of harm and ha[ve] acted with a conscious indifference to the health, safety and welfare of others." Or. Rev. Stat. § 31.730; *see also Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1336 (9th Cir. 1985) (upholding trial court's decision to withhold the punitive damages from the jury after the jury returned a verdict of no liability for negligence). Here, even if I accept the expert opinions Pirv offered, I nonetheless conclude that Pirv has failed to present sufficient evidence that defendants' conduct was so culpable as to justify punitive damages, as explained below. I therefore deny as moot Federal's motion to strike the expert opinions and Glock's objection to those opinions.

### III.   Motions for Summary Judgment on Pirv's Punitive Damages Claims

"Punitive damages are interpreted by the Oregon Supreme Court as 'a penalty for conduct that is culpable by reason of motive, intent or extraordinary disregard of or indifference to known or highly probable risks to others.'" *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1033 (9th Cir. 2003) quoting *Andor v. United Air Lines, Inc.*, 303 Or. 505, 739 P.2d 18, 25 (1987). Under Oregon law, a plaintiff in a products liability action cannot recover punitive damages unless the plaintiff can show that the defendant "acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to

FINDINGS AND RECOMMENDATION - Page 29

the health, safety and welfare of others." Or. Rev. Stat. §§ 31.730(1), 30.925(1). In addition,

punitive damages require proof by "clear and convincing evidence." Or. Rev. Stat. § 31.730(1).

### A.    Applicable Standard

In ruling on a motion for summary judgment, the court "must be guided by the

substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986). Thus, where a clear and convincing standard applies, the court views the

evidence in the light most favorable to the non-moving party and inquires "whether the evidence

presented is such that a jury applying that evidentiary standard could reasonably find for either

the plaintiff or the defendant." *Id.*; *see also Thompson v. Federico*, 324 F. Supp. 2d 1152, 1170

(D. Or. 2004) (reading the record in plaintiff's favor and applying the "clear and convincing"

standard to defendant's motion for summary judgment on plaintiff's claim for punitive damages

under Oregon law). Evidence qualifies as clear and convincing "when then the truth of the facts

asserted is highly probable." *Id.* (citation omitted).

Pirv, however, argues that the clear and convincing standard does not apply because

Oregon courts do not apply the standard when assessing the sufficiency of a plaintiff's evidence.

The Oregon Supreme Court has held that courts should not apply the clear and convincing

standard when ruling on a plaintiff's motion to amend a complaint to allege punitive damages.

*Bolt v. Influence, Inc.*, 333 Or. 572, 578, 43 P.3d 425 (2002).[12] In addition, the Oregon Court of

Appeals has stated that "the clear and convincing standard relates to how a jury weighs the

evidence, not to how a trial court assesses the capability of the evidence to establish facts."

---

12 The *Bolt* decision refers to Oregon Revised Statute section 18.535, which governed motions
to amend a pleading to state a claim for punitive damages, and section 18.537, which
governed the standard for an award of punitive damages. 333 Or. at 579-580. Those sections
have since been renumbered to section 31.725, governing motions to amend to add a claim for
punitive damages, and section 31.730, governing the standard for an award of such damages.

*Groth*, 209 Or. App. at 785 n.3; *see also Faber v. Asplundh Tree Expert Co.*, 106 Or. App. 601, 606, 810 P.2d 384 (1991).

"[U]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th Cir. 2001) (citation omitted). In *Snead*, the court held that application of *McDonnell Douglas* burden-shifting framework to plaintiff's state law claim did not violate *Erie*, despite that Oregon courts did not apply that framework, because the only difference between the state and federal regimes was whether the case would be dismissed at the summary judgment stage or at trial. *Id.* at 1091; *see also Safeway Stores v. Fannan*, 308 F.2d 94, 97 (9th Cir. 1962) ("[T]he quantum of proof necessary to sustain a cause of action . . . must be decided on the basis of federal and not state law.").

Similarly, here, assuming that Oregon courts do not apply the "clear and convincing" standard to a motion for summary judgment on a claim for punitive damages, a plaintiff would nonetheless have to meet that standard to recover punitive damages at trial. Thus, I conclude that the rule that courts sitting in diversity must assess a motion for summary judgment "through the prism of the substantive evidentiary burden" is procedural. *See Anderson,* 477 U.S. at 254; *Snead*, 237 F.3d at 1090. I therefore apply that rule here. *See Paugh v. King Henry's, Inc.*, No. 04-763, 2005 U.S. Dist. LEXIS 42164, at *30-31 (D. Or. June 30, 2005) (applying "clear and convincing" standard in motion for summary judgment on punitive damages claim); *Thompson*, 324 F. Supp. 2d at 1170 (same).

**B.    Whether the Factors Set Forth in Oregon Revised Statute Section 30.925(2) Apply**

Oregon Revised Statute section 30.925 specifically addresses punitive damages in the

FINDINGS AND RECOMMENDATION - Page 31

context of a products liability case. Subsection 30.925(1) provides that "punitive damages shall not be recoverable except as provided in ORS 31.730," which, in turn, imposes the "clear and convincing evidence" standard discussed above. Or. Rev. Stat. §§ 30.925(1), 31.730(1). Subsection 30.925(2) provides:

> (2) Punitive damages, if any, shall be determined and awarded based upon the following criteria:
>
> (a) The likelihood at the time that serious harm would arise from the defendant's misconduct;
>
> (b) The degree of the defendant's awareness of that likelihood;
>
> (c) The profitability of the defendant's misconduct;
>
> (d) The duration of the misconduct and any concealment of it;
>
> (e) The attitude and conduct of the defendant upon discovery of the misconduct;
>
> (f) The financial condition of the defendant; and
>
> (g) The total deterrent effect of other punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected.

Or. Rev. Stat. § 30.925(2).

Glock argues that the criteria set forth in section 30.925(2) pertain to the amount of punitive damages in a products liability case and thus are irrelevant here. In support of its argument, Glock cites *Groth*, which states that, "ORS 30.925(2) sets forth criteria for assessing the *amount of*, not entitlement to, punitive damages in products liability cases." 209 Or. App. at 787 n.5. Pirv does not disagree with Glock's analysis, but draws the court's attention to *Oberg v. Honda Motor Co., Ltd.*, 320 Or. 544, 552, 888 P.2d 8 (1995). In that case, the Oregon Supreme Court stated that "the substantive criteria to be considered by an Oregon factfinder in deciding

FINDINGS AND RECOMMENDATION - Page 32

whether to make an award of punitive damages in a product liability action and, if so, in setting the award, are set out in ORS 30.925." *Id.*

I need not resolve the issue because I find that, even if section the 30.925(2) factors pertain to the amount of punitive damages, several of the factors are nonetheless relevant because they relate to whether the defendant acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm. Or. Rev. Stat. § 31.730(1). The likelihood of serious harm and the defendant's awareness of that likelihood; the duration of the misconduct and any concealment of it are all relevant to whether the defendant acts were sufficiently culpable. Or. Rev. Stat. § 30.925(2)(a), (b), (d). In addition, the profitability of the misconduct and the defendant's conduct upon discovery may, in some circumstances, be relevant to show malice or reckless and outrageous indifference. Or. Rev. Stat. § 30.925(2)(c), (e); *Lakin v. Senco Prods., Inc.*, 144 Or App. 52, 71-73, 925 P.2d 107 (1996) (manufacturer failure to address tendency of nail gun to double fire was motivated in part by the profits it gained from sales of nails). The remaining factors, however, plainly relate solely to the amount of the award. Or. Rev. Stat. § 30.925(2)(f), (g).

### C.     Whether Evidence Is Sufficient to Submit the Matter to the Jury

As a general matter, "punitive damages are allowed in Oregon to punish a willful, wanton or malicious wrongdoer." *Strawn v. Farmers Ins. Co.*, 228 Or. App. 454, 478, 209 P.3d 357 (2009) (citation omitted). Thus, a defendant's failure to act is not sufficient evidence to survive summary judgment on a punitive damages claim where the plaintiff has not presented evidence that the defendant's failure was the result of "conscious indifference" to the plaintiff's welfare. *See Andor*, 303 Or. at 515 (no punitive damages where pilot did not land plane, despite running low on fuel, because pilot was concerned about possible landing gear malfunction and had

FINDINGS AND RECOMMENDATION - Page 33

miscalculated remaining amount of fuel); *Shusterowitz v. Salem Assocs.*, N0. 00-827, 2001 U.S. Dist. LEXIS 22742, at *20-23 (D. Or. Dec. 13, 2001) (granting defendant's motion for summary judgment on punitive damages because evidence did not establish the defendant respite home acted with conscious indifference where nothing indicated that it intentionally jeopardized resident care by ignoring complaints, failure to train, or other similar conduct); *Thompson*, 324 F. Supp. 2d at 1171 (no punitive damages where stockbroker failed to sell a trust's equity holdings as requested because he was waiting for the market to improve).

In products liability cases, courts properly submit the question of punitive damages to the jury where the evidence shows the manufacturer purposefully disregarded a known risk to consumer safety. See *McEuin*, 328 F. 3d at 1036-1037 (trial court properly denied manufacturer's motion for judgment as a matter of law where plaintiff presented evidence that the manufacturer knew of other collision-based injuries involving its forklift, attempted to conceal that its product was defective and retained the product design to avoid an inference that it had corrected a known design defect); *Groth*, 209 Or. App. at 785-786 (trial court properly denied manufacturer's motion for a directed verdict where the manufacturer knew that objects could come loose from the lathe clamps, did not warn customers of the limits of safe use and modified the product only to provide an appearance of safety); *Lakin*, 144 Or App. at 71-73 (upholding denial of directed verdict where manufacturer knew of tendency of nail gun to double fire but conducted no tests of how often that occurred, the extent of injury that might result, or whether its safety warning was effective to avoid such injury and the manufacturer's failure to address the issue was motivated in part by the profits it gained from sales of nails).

Moreover, courts have upheld a jury's decision to award punitive damages where the evidence at trial showed that a manufacturer knew of the potential risks of its product and

FINDINGS AND RECOMMENDATION - Page 34

consciously failed to improve product safety and/or product warnings. *See Ingram v. AC & S, Inc.*, 977 F.2d 1332, 1342 (9th Cir. 1992) (sufficient evidence supported jury award of punitive damages where evidence showed manufacturer new of the risks of asbestos and failed to warn users); *Waddill v. Anchor Hocking, Inc.*, 190 Or. App. 172, 179-180, 78 P.3d 570 (2003) (evidence showed that the manufacturer knew of three other incidents in which customers were injured by fishbowls that shattered during ordinary use and did not retain records of those incidents nor make any effort to improve product safety); *Axen v. Amer. Home Prods. Corp.*, 158 Or. App. 292, 294, 974 P.2d 224 (1999) (drug manufacturer knew that studies had linked drug to vision loss and made a conscious choice not to warn of the risk, due in part to financial concerns related to its ability to market the product); *Oberg*, 320 Or. at 553-555 (manufacturer knew that ATVs were prone to tip over accidents before it developed its ATV model but failed to conduct adequate safety testing and failed to consider adequate protections for ATV users but maintained that there was nothing wrong with its product design and testing and continued to make profits from sales of ATVs for more than 15 years); *Joachim*, 48 Or. App. at 386-389 (defendant's active efforts to conceal danger of contaminated water demonstrated wanton misconduct).

### 1.    Evidence Offered Against Glock

Pirv's evidence of prior incidents of Glock 21 failures is insufficient to establish that the Glock defendants acted with the requisite outrageous indifference to a highly unreasonable risk of harm and conscious indifference to the safety of others. His evidence shows thirteen previous incidents over a period of thirteen years. In only one of those incidents, the 1991 lawsuit, does the evidence show that Glock was aware of a serious injury that had been attributed to the design of the Glock 21. The evidence of the 1995 lawsuit and claim also allege severe injury, but there is no indication that Glock knew the failure was due to a problem with its product. The claim

FINDINGS AND RECOMMENDATION - Page 35

letter includes no information regarding a possible cause and the 1995 lawsuit included allegations against the manufacturer of the reloaded ammunition involved. Similarly, the three reports Glock, Inc. received regarding injuries appeared to have involved reloaded ammunition in two instances. Finally, the reports from Federal reflect merely that Glock, Inc. was aware of seven other failures, but do not indicate that Glock, Inc. was aware of the cause, if injuries resulted, or if it shared any of that information with Glock Ges.m.b.H. Thus, over a thirteen year period, only one incident contains sufficient information to put Glock on notice that its product might be defectively designed or inadequately tested and that such problems could lead to serious injury.

Pirv, however, also argues, citing *Waddill*, that punitive damages are appropriate because Glock ignored the risk by failing to adequately evaluate pistol failures or maintain sufficient records of such failures. In *Waddill*, the court upheld the jury decision to award punitive damages where the defendant was aware, as a the result of legal actions against it, of three other incidents over a ten year period in which customers were injured by the defendant's fishbowl, which shattered. 190 Or. App. at 179. The defendant, however, destroyed records that were more than five years old and thus did not retain records of those incidents, nor did it share the information with its product engineering manager. *Id.* The court concluded, based on that evidence, that the jury "could reasonably have drawn the inference . . . that the defendant acted with conscious indifference to the possibility that the fishbowl it manufactured could injure someone during ordinary use and that that conscious indifference implied a willful disregard of a known risk to consumer safety." *Id.* at 180; *see also Lakin*, 144 Or. App. at 71-74 (defendant conducted no tests to determine how frequently its nail gun double-fired or what injuries might result).

FINDINGS AND RECOMMENDATION - Page 36

Unlike the defendant in *Waddill*, however, Glock, Inc. saved and produced records pertaining to three prior legal claims and two customer complaints against it. In addition, unlike the situation in *Waddill*, where the defendant's product was the only product involved in the user injuries, here both Glock pistols and another manufacturer's ammunition were involved, such that a pistol failure was not necessarily indicative of a problem with the pistol. Moreover, the evidence shows that sometimes the ammunition manufacturer performed an inspection and sometimes Glock performed an inspection regarding the failure and that the two parties often shared information regarding those tests. Thus, Pirv's evidence shows that, in retrospect, Glock certainly could have been more thorough in its assessment of pistol failures to ensure that metallurgical defects or the design of the rails or chamber walls were not at fault. The evidence, however, does not establish that Glock ignored a known risk to customer safety. The court should therefore grant the Glock defendants' motion for summary judgment on Pirv's punitive damages claim.

### 2.    Evidence Offered Against Federal Cartridge

Pirv's evidence falls short of establishing that Federal Cartridge showed reckless and outrageous indifference to a highly unreasonable risk of harm, or that it acted with conscious indifference to the safety of others. The evidence shows twenty previous incidents over a period of seven years but only one of those incidents resulted in serious injury. More importantly, Pirv's evidence fails to establish that it was "highly probable" that Federal knew its ammunition manufacturing process was at fault for those incidents. None of the incident reports plainly indicates that the cartridge was dangerously defective when it left Federal. Rather, in the five instances involving feed ramp blow outs and webb failure either the ammunition or the gun could have been defective. Similarly, the nine bullet-in-bore incidents could have been caused

FINDINGS AND RECOMMENDATION - Page 37

by an ammunition manufacturing defect or by contamination of the cartridge after it left the factory. For the remaining incidents, the cause was similarly unclear.

Moreover, the evidence fails to show that Federal purposely concealed its potential responsibility. The evidence fails to show that Federal inappropriately used International Traffic in Arms Regulations as an excuse to withhold evidence in this case. In addition, although Pirv has submitted evidence that, in one incident, Federal did not reveal testing results that suggested a Glock pistol defect caused the failure, that evidence shows only possible collateral misconduct. *See Coursen*, 764 F.2d at 1336 (citing Oregon law for the proposition that collateral conduct is irrelevant to punitive damages because such damages are "justified on a theory of deterring conduct which caused harm to plaintiff"). Based on all of the foregoing, I recommend that the court grant Federal's motion for summary judgment regarding Pirv's punitive damages claim.

## CONCLUSION

For the reasons set forth above, Pirv's motion for default order and alternative motion for sanctions (#260) should be granted in part and denied in part. The court should deny the motion for default and grant the alternative motion for an adverse inference sanction against Glock, Inc. only. Glock Defendants' motion for partial summary judgment (#256) should be granted. Federal Cartridge's motion to strike evidence (#301, #308) should be granted in part, denied in part and denied as moot in part as stated herein. Federal Cartridge's motion to strike expert opinions (#302) should be denied as moot. Federal Cartridge's motion for partial summary judgment (#251) should be granted.

/ / /

/ / /

/ / /

FINDINGS AND RECOMMENDATION - Page 38

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 15th day of July, 2010.

Honorable Paul Papak
United States Magistrate Judge

FINDINGS AND RECOMMENDATION - Page 39